# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| JASON TROWBRIDGE and JAIME TROWBRIDGE, individually and as natural parents of J.N.T., a minor child,<br><br>        Plaintiffs,<br><br>vs.<br><br>UNITED STATES OF AMERICA,<br><br>        Defendant. | Case No. CV 07-32-S-REB<br><br><br>**MEMORANDUM DECISION AND ORDER ON DEFENDANT'S MOTION IN LIMINE (Docket No. 58)** |

Pending before the Court is Defendant United States' Motion in Limine (Docket No. 58). The Court has considered the parties' briefing, the record, and heard oral arguments at the June 18, 2009 hearing. The Court renders this decision and order upon the issues raised in that motion.

## I. BACKGROUND[1]

Plaintiffs Jason and Jamie Trowbridge brought this medical malpractice action against the United States ("the Government"), alleging that their daughter, J.N.T., suffers from cerebral palsy and other medical difficulties as a result of Dr. Samuel Ogden's alleged

---

[1] Except where otherwise noted, the basic facts in this section are summarized from Defendant's Memorandum (Docket No. 58-2) because Plaintiffs agree that "[t]he basic facts relevant to this motion are well stated by Defendant in its brief," Pls.' Mem., p. 2 (Docket No. 67). The Court will not attempt to repeat definitions for the clinical terms or abbreviations used in this decision relating to the medical issues, as those terms and acronyms are known to the parties.

negligence in treating Jamie in August 2004 during her labor and delivery at St. Luke's Magic Valley Regional Medical Center, in Twin Falls, Idaho.

On August 5, 2004, Ms. Trowbridge was admitted to St. Luke's for induction of labor. At 9:07 a.m., Pitocin was started, and was increased at various times through 5:17 p.m. At around 4:40 p.m., the contraction pattern reflected tachysystole. At approximately 8:46 p.m., Ms. Trowbridge's temperature began to rise. Around the same time, the FHR became tachycardic. At 9:40 p.m., Dr. Ogden suspected an infection, chorioamnionitis, and ordered the administration of an antibiotic. Dr. Ogden stated in his deposition that he believed the tachycardia was due to the maternal fever. Grisham Decl., Ex. 2, Ogden Dep., pp. 14-15 (Docket No. 58-14).

On August 6, 2005, at approximately 12:50 a.m., the FHR dropped to what is termed as "terminal bradycardia." Dr. Donald Smith, the OB/GYN on call, and Dr. Ogden, determined that an emergency C-section was necessary. Ms. Trowbridge was taken to the operating room and at 1:14 a.m. the baby was delivered via C-section. When delivered, the baby had a tight nuchal cord. On June 15, 2006, J.N.T. was diagnosed with cerebral palsy.

A court trial in this case is set to begin June 29, 2009. The Government seeks to exclude from trial the standard of care opinions of Plaintiffs' expert Dr. Michael L. Hall, a board certified OB/GYN from Colorado, arguing that (1) Dr. Hall has not adequately familiarized himself with the relevant standards of care in Twin Falls, Idaho and (2) his opinions are not reliable under *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) and Federal Rule of Evidence 702. Defendant also requests exclusion of many of Dr. Hall's rebuttal opinions on the grounds that they are not reliable and/or they constitute improper rebuttal.

**MEMORANDUM DECISION & ORDER - 2**

## II.  DR. HALL'S FAMILIARITY WITH THE LOCAL STANDARD OF CARE

Defendant argues that Dr. Hall has not adequately familiarized himself with the relevant standards of care in Twin Falls, Idaho and, therefore, his standard of care opinions are inadmissible under Idaho law.

### A.    Legal Standards

The decision to admit expert testimony is a matter of discretion for the trial court. *Clausen v. M/V NEW CARISSA*, 339 F.3d 1049, 1055 (9th Cir. 2003).  An appellate court may reverse the trial court only if "left with a definite and firm conviction that the district court committed a clear error of judgment in admitting [expert] testimony." *Id.  See also Millenkamp v. Davisco Foods Intern., Inc*., 562 F.3d 971, 979 (9th Cir. 2009) (applying the abuse of discretion standard and finding the district court did not abuse its discretion in admitting expert testimony).[2]

"As a threshold matter, to be admissible in a medical malpractice action, expert testimony must demonstrate the expert's familiarity with the applicable standard of care for a particular profession for the relevant community and time, and the proponent must show the basis for the expert's knowledge." *Edmunds v. Kraner*, 136 P.3d 338, 345 (2006) (citing *Perry v. Magic Valley Reg'l Med. Ctr.*, 995 P.2d 816, 821 (2000)).  Idaho Code §§ 6-1012 and 6-1013 impose requirements on an expert's testimony in a medical malpractice case.[3]

---

[2]  The standards in Idaho for admission of medical expert testimony in a medical malpractice case are in accord: "The admissibility of expert testimony is a matter committed to the discretion of the trial court, and the court's ruling will not be overturned absent an abuse of that discretion." *Athay v. Stacey*, 128 P.3d 897, 903 (2005).  *See also Jones v. Crawforth*, 205 P.3d 660, 666 (2009).

[3]  The United States is named as a defendant under the Federal Tort Claims Act ("FTCA") 28 U.S.C. §§ 1346, 2671-2680; FTCA actions are governed by the substantive law of the state in which the act or omission occurred, *id.* §§ 1346; 2674.

Idaho Code § 6-1012 requires a plaintiff to "affirmatively prove by direct expert testimony" that the health care provider negligently failed to meet the community standard of health care, as it existed at the time and place of the alleged negligent act. "[I]ndividual providers of health care shall be judged in such cases in comparison with similarly trained and qualified providers of the same class in the same community, taking into account his or her training, experience, and fields of medical specialization, if any." *Id.*

Idaho Code § 6-1013 requires that the expert show that his opinion can be testified to with a reasonable degree of medical certainty, and that he or she is not only an expert but also "actual knowledge of the applicable said community standard" to which his expert opinion testimony is addressed. "[A] competent expert witness who resides elsewhere" is not prohibited from testifying if he "adequately familiariz[es] himself with the standards and practices of (a particular) such area." Idaho Code § 6-1013.

The requirements of Title 6, Chapter 10 of the Idaho Code present substantive pleading and proof requirements for a medical malpractice plaintiff and his or her counsel. As noted sagaciously by Mr. Pedersen during oral argument, a challenge to the bona fides of the plaintiff's expert opinion based upon the requirements of Idaho Code § § 6-1012 and 6-1013 is the equivalent threat to a plaintiff's case as a motion for summary judgment, but without the tilt of the table benefitting the non-movant that comes with application of Rule 56. The referenced statutes have been the subject of regular motion practice, frequent appellate review, and constant public policy debate in the years since their enactment. Their requirements remain an unavoidable measuring stick in any malpractice case brought under Idaho law. The battle line in this case is therefore a familiar one for purposes of the Government's motion in limine: did Dr. Hall have actual knowledge of the standard of care

applicable to Dr. Ogden's medical care in Twin Falls, Idaho on August 5 and 6, 2004 and, if so, is he competent to express an opinion adequately identifying alleged breaches of that care.

**B.     A Requirement of Exacting Description or a Simple Disclosure of Subject Matter?**

The Government has argued strenuously that whatever Dr. Hall may have done in his attempt to identify a community standard of care for Dr. Ogden, he did not do so with enough particularity to meet the requirements of Idaho Code §§ 6-1012, 1013. To hold otherwise, the Government argues, potentially leaves Dr. Ogden at risk of being held liable for a breach of medical care that did not exist at the time Dr. Ogden rendered his care. It is not enough, in the Government's view, for Dr. Hall to opine in what the Government contends are more general terms than not, that Dr. Ogden's care during labor and delivery was substandard. The Government argues that a more specific reference to particular facts is required, accompanied by some proof that Dr. Hall obtained information as to what the particular medical response, as required by local customary care, would have been in Twin Falls, Idaho at the time of Ms. Trowbridge's labor.

The Trowbridges argue in response that the expert opinion required under Sections 6-1012 and 1013 is, in actuality, only a disclosure requirement, similar in that regard to any type of discovery response, subject therefore to general notions of adequate notice of intended testimony, supplementation as a matter of course or a matter of necessity, and similar familiar requirements of Rule 26(b). In that setting, the Trowbridges contend that Dr. Hall's expert witness disclosure is more than adequate and, additionally, his rebuttal expert report does not contain impermissible rebuttal testimony.

Dr. Hall's knowledge of a community standard of care for labor and delivery in Twin Falls during August of 2004 is based on his review of the hospital's protocol for the use of

Pitocin (oxytocin), the deposition testimony of the nurses involved, the deposition testimony of the defendant Dr. Ogden (the family practitioner attending Ms. Trowbridge's labor), and Dr. Smith (the consulting OB/GYN who delivered J.N.T. by caesarean procedure). *See* Whitehead Decl., Ex. B, Hall Dep., p. 15 (Docket No. 68-3).

Dr. Ogden testified that the following standards of care existed in Twin Falls, Idaho, in August 2004:  a doctor should not prescribe a medication with which he was not familiar Grisham Decl., Ex. 2, Ogden Dep., p. 9 (Docket No. 58-14); doctors who delivered babies were expected to know how to read and interpret FHR tracings (*Id.* at pp. 10-11); doctors who delivered babies should have known what uterine hyperstimulation is and that it can be caused by Pitocin (*Id.* at p. 19); any doctor who used Pitocin should have known it can always be turned off (*Id.* at 22); and doctors should not have subjected a patient or an unborn baby to any unnecessary risk (*Id.* at 37).  Doctor Ogden also testified that a potential intervention for certain clinical situations in labor, is to turn down the Pitocin or turn it off entirely to see if it will correct a nonreassuring feature on the fetal monitoring strip.  *Id.* at p. 21.

Dr. Smith testified to the following relevant standards: Doctors in Twin Falls during 2004 should have understood the use of a differential diagnosis, Grisham Decl., Ex. 3 (Smith Dep., at p. 14); should have known how to read and interpret FHR tracings (*Id.* at p. 16); should have known the terms used to describe FHR tracings (*Id.* at pp. 12-19); should have known about changes in an FHR baseline and their possible causes (*Id.* at pp. 12-21); should have known contractions can be too strong, too frequent or too close together (*Id.* at pp. 24-25); should have known what drug manufacturers say about drugs they were administering (*Id.* at p. 27); should have known Pitocin is known to have the potential for overstimulating the uterus (*Id.*); should have known the response to Pitocin can be very individualized and can

vary from one woman to another (*Id.*); should have known to start with a small amount of Pitocin and increase it (*Id.* at pp. 27-28); should have known to monitor contractions and FHR when using Pitocin (*Id.* at p. 24); should have known not to use more Pitocin than needed (*Id.* at pp. 21-29);  should have known overstimulation of the uterus can have negative and/or catastrophic effects on the baby and/or the mother (*Id.* at pp. 30-31); should have known Pitocin can overstimulate the uterus and cause a baby to become hypoxic (*Id.* at p. 31); should have known that if there is overstimulation of the uterus, and it is having a deteriorating effect on the baby, you can turn the Pitocin down or off to see if you can improve the situation (*Id.* at pp. 31-32); and should not have allowed a prolonged period of overstimulation where there was evidence that it is having a negative effect on the fetus (*Id.* at p. 32).

    The Government contends that such information, even combined with the information in the record about hospital protocols for the use of Pitocin and the testimony of the nurses, is insufficient to establish a community standard such as Dr. Hall, in his expert report and deposition, alleges was breached by Dr. Ogden.  The Government, as discussed previously, contends that those standards of care with which Dr. Hall did acquaint himself (through the deposition testimony of Ogden and Smith, primarily) are generalized standards, and that Dr. Hall's opinions premised upon more particular standards lack a source foundation–*i.e.*, Dr. Hall cannot tie the more particular standard to any source that would say that such a particular standard applied to the delivery of a baby in Twin Falls, Idaho in August of 2004.  The Government's prime example for such an argument is Dr. Hall's opinion that Dr. Ogden breached the standard of care by not decreasing or turning off the dosage of Pitocin in response to what Dr. Hall contends were clinical signs of fetal distress.  Such detail, according to the Government, necessarily includes detail about particular circumstances that were never

discussed or described in the depositions of Dr. Ogden or Dr. Smith.  The Government argues

that Dr. Hall's opinion rests upon a purported standard of care that has no basis in the record

and therefore fails the requirements of Idaho Code § 6-1013.

However, Dr. Smith agreed in his deposition that a relevant "standard of care" is to

"not allow prolonged periods of overstimulation where there's evidence that it's having a

negative effect on the fetus," Grisham Decl., Ex. 3, Smith Dep., p. 32 (Docket No. 58-15), and

"if you have a situation where you determine that there's overstimulation of the uterus and it's

having deleterious effects on the baby, that you can turn the Pit[ocin] off or down to see if you

can improve the situation."  *Id.*  Thus, the dispute here lies not with Dr. Hall's opinion that the

Pitocin should have been turned down or off because he believes that there were signs of fetal

distress, but rather whether the conditions present during Ms. Trowbridge's labor demonstrated

that the fetus was in distress.  That is, Dr. Smith's testimony can support the Plaintiff's

contention that the standard of care is to turn down or off the Pitocin if available information

indicates fetal distress, and a breach of that standard occurs if the conditions indicate such

distress that may be caused by the Pitocin and the attending doctor does not attempt to adjust

the Pitocin.

The Court recognizes and agrees that additional questions could have been asked about

particular details of the care, and in so doing the standard of care might or might not have been

more finely tuned.  But to require that the standard of care testified to by Dr. Smith be

unraveled with a specific set of FHR readings and patterns to demonstrate fetal distress could

require perhaps hundreds of articulations of particular details based on every clinical situation

that could possibly present during labor.  The Court acknowledges that, to a point, the very fact

of such an array of possibilities is part of the Government's rationale for arguing that Dr. Hall

has not sufficiently identified and defined a community standard of care to fit the care given to Jamie Trowbridge and her unborn child.  But the record does contain certain fundamental and not necessarily general standards of care in place in Twin Falls in August of 2004, contained primarily in the depositions of Drs. Smith and Ogden.  Further, if physicians may not agree upon what certain information may mean or what action might be called for in the face of particular information in the labor and delivery room, that possibility of differing views does not mean that a standard of care does not exist.  It simply means that there may be disagreement between physicians over what action or inaction might be appropriate and that, in turn, may be entirely relevant to whether or not the standard of care has been breached.

The Government relies upon a trio of cases in making its argument that Dr. Hall's opinion lacks sufficient foundation: *Shane v. Blair*, 75 P.3d 180 (Idaho 2003); *Rhodehouse v. Stutts*, 868 P.2d 1224 (Idaho 1994); and *Kunz v. Miciak*,, 795 P.2d 24 (Idaho Ct. App. 1990). The Trowbridges refer the Court to other decisions, *e.g.*, *Grover v. Smith*, 46 P.3d 1105 (Idaho 2002); *Kozlowski v. Rush*, 828 P.2d 854 (1992).   Although useful for guidance, none of the decisions is directly controlling upon the exercise of the Court's discretion in this particular case.  For instance,  the Government suggests that the holding of *Shane* requires this Court to rule that Dr. Hall must establish a familiarity with a community standard of care that is bedrocked upon the exact, particular, detailed facts of this case.  In doing so, the Government relies primarily  upon the language found in *Shane*, that "the standard of care is simply the care typically provided under *similar circumstances* by the relevant type of health care provider in the community at the time and place of the alleged negligent act."  *Shane*, 75 P.3d 180, 184 (emphasis supplied).  The Trowbridges refer to this particular language as dicta.

Upon close reading, the particular language of *Shane* relied upon by the Government does not support the Government's motion.   The remainder of the paragraph in which the sentence appears, and the relevant following paragraphs read thusly:

> Esses's fourth affidavit and Coleman's affidavit demonstrate sufficient personal knowledge of the standard of care in Pocatello in 1997 for the back surgery performed on Shane.  For that reason, the district judge erred in striking those affidavits.  Coleman has practiced medicine and taught orthopedics at the University of Utah School of Medicine for more than forty years. During that time, Coleman has taken numerous referrals of patients from Idaho Falls and Pocatello for orthopedic treatment and has discussed lumbar-surgery cases with Pocatello surgeons.  Coleman has also reviewed hundreds of medical records from orthopedic surgeons in Idaho Falls and Pocatello throughout the years, including 1997.  Coleman's experience establishes that he has sufficient knowledge of the relevant standard of care, and such knowledge of the relevant standard of care in Pocatello in 1997 is demonstrated in his affidavit.
>
> As a result of his personal knowledge, Coleman's comments on the standard of care relevant to Shane's 1997 back surgery in Pocatello are admissible.  *See Perry,* 134 Idaho at 51, 995 P.2d at 821; *see also Grover,* 137 Idaho at 252-53, 46 P.3d at 1110-11 (stating physician does not necessarily have to have practiced in the same geographic area as defendant to become familiar with local standard of care).  Coleman was giving an opinion no different than if he were actually practicing in Pocatello, and this satisfies the personal knowledge requirement of I.C. § 6-1013.  Moreover, Esses's fourth affidavit is admissible to the extent it relies on information acquired from Coleman.  *See* I.C. § 6-1013 (providing for admissibility of testimony from out-of-area experts who adequately familiarize themselves with standards and practices of relevant area); *see also Perry,* 134 Idaho at 51, 995 P.2d at 821 (noting out-of-area expert may obtain knowledge of local standard of care by consulting with specialist who has personal knowledge of local standard of care).  Because of Coleman's personal knowledge of the standard of care in Pocatello in 1997, the foundational requirements for both Coleman's and Esses's affidavits have been satisfied.  *See* I.R.C.P. 56(e).

*Id.*

**MEMORANDUM DECISION & ORDER - 10**

Significantly, the standard of care foundation issue arose in *Shane* in the context of the Plaintiff's expert talking to another out-of-state physician, about that physician's knowledge of the local standard of orthopedic care in Pocatello, Idaho.[4]   The other physician, located in Salt Lake City,  had consulted on a number of orthopedic cases with doctors in Pocatello.  It was the history of consultations from which the other physician had knowledge of the standard of care in Pocatello, and in turn it was his description of such information to the Plaintiff's expert that the Idaho Supreme Court found to be a sufficient basis to meet the requirements of Section 6-1013.  There is nothing in *Shane* to indicate that the Idaho Supreme Court was focused upon the exacting details of the care provided to the plaintiff in that case, at least not for purposes of the formulation and confirmation of a local community standard of care.  Indeed, the consulting physician based in Salt Lake City could be presumed to know nothing of the particular details of the care in the Pocatello case, not having been involved directly in such care.  However, the consulting physician in Salt Lake City could be and apparently was considered by the Supreme Court to be knowledgeable about the general standards of orthopedic care in the Pocatello community based upon his long history of working with Pocatello physicians on their cases.

---

[4]   Counsel for the plaintiff in *Shane* had made several runs at establishing the foundational basis for the expert witness's knowledge of the community standard of care, which had been rejected by the trial court.  The final effort involved a supplemental affidavit from the expert discussing his conversations with an orthopedic medicine expert in Salt Lake City, who said in his own affidavit that he had been consulting on orthopedic cases for physicians in Pocatello for 40 years, and knew the local standard of care as a result of those consultations.  The Salt Lake City physician submitted his own affidavit, but the dispositive fact for the Idaho Supreme Court in holding that the original expert had satisfied the requirement for learning the community standing of care was the fact of the original expert's conversation with the Salt Lake City consulting physician, who had never practiced in Idaho.

Perhaps there was more detail of the clinical care involved in the *Shane* case that never made its way to the appellate courtroom; however, if there was, such detail was not significant to the Idaho Supreme Court in reaching its decision, as there is no mention of such detail or the need for such detail.  This Court does not, therefore, read the *Shane* court's reference to "the care typically provided under similar circumstances" as implementing a watchmaker's precision upon the standard of care evidence required of a plaintiff by Idaho Code §§ 6-1012 and 6-1013.  The reference to "similar circumstances" is, at best, a rephrasing of other descriptions of the community standard requirement and nothing in the *Shane* decision turns upon the particular words of "similar circumstances."

The *Rhodehouse* decision is also distinguishable.  In *Rhodehouse*, the plaintiff's expert relied in primary part, as in this case, upon the deposition of the treating (defendant) physician. However, the defendant physician (Stutts) never stated in his deposition that the local standard of care was the same as the national standard of care for board certified cardiologists, which the plaintiff's expert said  was the local standard.  Without that connection, the trial court determined that the plaintiff's expert's affidavit was inadmissible.[5]  *Rhodehouse v. Stutts*, 868 P.2d 1224, 1227.

The *Rhodehouse* court affirmed the trial court, but did not foreclose the ability of an expert to familiarize himself with the community standard of care through review of depositions taken of the treating physicians.  The expert in *Rhodehouse* did not state in his affidavit how it was that he became familiar with the local standard of care in regard to what the court ultimately characterized as an unsupported, conclusory statement about a national

---

[5]  The *Rhodehouse* case turned upon the foundational requirements of affidavits submitted in opposition to a motion for summary judgment under Rule 56 of the Idaho Rules of Civil Procedure.

standard applying locally that he was familiar with the standard.  *Id.*, 868 P.2d at 1229.  In the

instant case, Dr. Hall has stated he reviewed the depositions taken of Dr. Ogden and Dr. Smith

to determine the community standard of care and has set out in his expert report a numbered

list of particular types of care that are contained in that standard, based upon his review of

those depositions.

The Court concludes that in this case, Dr. Hall's use of the information contained in the

depositions of Drs. Ogden and Smith is more akin to reliance upon a direct affirmative

statement of the local standard of care, as set out in the numbered paragraphs of his expert

report, than it is to some inference about a local standard of care gleaned by an expert from

questions posed to the treating physicians about the actual course of care.  Described more

succinctly, the Court views Dr. Hall's testimony as identifying a local standard of care based

upon reasonably identified actual local parameters of care (*e.g.*, Dr. Smith's agreement that the

"standard of care" includes "not allow[ing] prolonged periods of overstimulation where there's

evidence that it's having a negative effect on the fetus," and that "if you have a situation where

you determine that there's overstimulation of the uterus and it's having deleterious effects on

the baby, that you can turn the Pit[ocin] off or down to see if you an improve the situation,"

Pls.' Mem., Ex. B, Smith Dep., p. 32) and then rendering his opinion that the standard was

breached in particular details (*e.g.,* Dr. Hall's opinion that Dr. Ogden should have reduced the

dosage of Pitocin or discontinued it entirely to determine what effect that would have upon the

fetus).

These issues as to where the standard of care can and is mapped for purposes of

meeting the requirements of Sections 6-1012 and 6-1013 are sometimes difficult to precisely

discern and quantify for the courtroom.  They are, in that way, emblematic of the concern the

**MEMORANDUM DECISION & ORDER - 13**

Government would raise – that, without more precision, the Defendant is at risk of being held liable for failing to meet a standard of care he did not know existed.  But any negligence case, including those that have the codified framework of a medical malpractice claim under Idaho law, has some grainy  edges.  Indeed, if each particular act or even moment of repose of a physician in the care of a patient was a separate and distinct "standard" in the care of a patient, then an actual standard of care (community standard or not) might be simply illusory.  The Government's position argues around the edges of that void, in that the Government contends that there is no agreement among labor and delivery physicians about how to interpret fetal monitoring strips.  Therefore, the Government argues, there can be no breach of standard of care in this case, because impliedly in the fact of a lack of consensus, there can be no accepted standard and, therefore, Dr. Hall cannot possibly have familiarized himself with a community standard about such things because there is no accepted consensus about such matters.

There are several flaws in such an argument.  First, an argument that there must be a consensus among specialty physicians about how to interpret the information contained in a fetal monitoring strip in order for there to be any standard of care based upon the use of such strip ignores the obvious--labor and delivery physicians use fetal monitoring to gather information from which they make decisions about how to conduct their care in the labor and delivery process.  Second, the Government's argument is the logical parallel, albeit inverted, of the expert who contends on behalf of an injured plaintiff that a national board-certification standard applies to any local physician who is board-certified in a particular specialty.  The Idaho case law is abundantly clear that such a claim does not meet the requirements of Sections 6-1012 and 6-1013 without a further foundation link establishing that the expert has informed himself by further inquiry that the local physicians agree that national board-certification

standards are the standards that apply to the local practice of medicine in that speciality.  The testimony of Drs. Ogden and Smith do not indicate that the local standard of care in Twin Falls in August of 2004 for labor and delivery physicians was that there was *no* standard of care pertaining to how a physician was to interpret a fetal monitoring strip.  If that were the case, then the standard of care would be that there is no need to consider the fetal monitoring strip at all.[6]  To the contrary, the fetal monitoring strip contains information that is monitored by the attending physician and is used to make decisions–whether they be to leave the labor well enough alone or whether to take some proactive step to change the nature of the labor–and therefore it is inextricably tied to the standard of care in many of the particular instances described by Dr. Ogden, Dr. Smith, and Dr. Hall.

The logic applied by the Court here has sound foundations in the record.  By example, a review of Dr. Smith's testimony reveals that the community standard of care is to reduce the Pitocin dosage, or to stop it entirely, when there is evidence that the drug's effect upon the mother's labor is having a negative effect upon the fetus.  The fetal monitoring strip is one way, and a commonly used method, to track the well-being of the fetus.

Accordingly, in the exercise and within the bounds of its discretion, the Court rules that the Plaintiffs' expert, Dr. Hall, has adequately demonstrated that he possesses "professional knowledge and expertise coupled with actual knowledge of the applicable said community standard to which his . . . expert opinion testimony is addressed."  Idaho Code § 6-1013.  In that regard, as to the matters contained in his original expert report, as enlarged upon by the testimony given in his deposition, the Government's motion in limine is denied.  However, in so

---

[6]  Moreover, as Plaintiff describes, the factual underpinning for such a "standard," as argued by the Government (the articles published in the medical journals on the topic, *see* Def.'s Mem., Ex. C (ACOG Bulletin, Dec. 2005)), stem from articles published some time *after* August 2004.  *See* Def.'s Mem., p. 18 (Docket No. 58-2).

ruling this Court does not and will not grant a *laissez-faire* use of Dr. Hall and his opinions at trial.  Dr. Hall's testimony will be limited to testimony directly drawn from his expert report and his deposition testimony, and the opinions expressed by him in those sources that are directly related to the particular touchstones of care, as set out in his report and his deposition that he contends form the applicable standard of care in Twin Falls at the time of the delivery of J.N.T.  In addition, Dr. Hall will be allowed to testify to those matters which are the proper subject of rebuttal testimony, as set out elsewhere in this decision.

This decision does not prevent the Government from contesting whether or not Dr. Hall's characterization of the community standard of care is a correct characterization.  It does not prevent the Government from arguing that even if Dr. Hall's characterization is accepted, there nonetheless was no breach of that standard of care by Dr. Ogden.  Nor does this decision preclude the Government from raising objections at trial, to the extent that such objections are based upon the Government's good faith belief that questions posed to, or testimony given by, Dr. Hall, cross over the line drawn by this decision.

## III.   *DAUBERT* CHALLENGE

### A.   Legal Standards[7]

A witness who has been qualified as an expert by knowledge, skill, experience, training, or education may give an opinion on scientific, technical, or otherwise specialized topics "... if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods

---

[7]  Although state substantive law applies in this case, the federal procedural rules govern evidentiary issues.  *See Taylor v. United States*, 821 F.2d 1428, 1432 (9th Cir. 1987); *Hernandez v. Sutter Med. Ctr. of Santa Rosa*, 2008 WL 2156987 at *9-13 (N.D. Cal. May 20, 2008).

reliably to the facts of the case." Fed. R. Evid. 702.  Trial judges have a responsibility to act as

gatekeepers to exclude all types of unreliable expert testimony.  Fed. R. Evid. 702, Advisory

Committee Notes (2000).  To exercise this responsibility, ". . . the trial judge must have

considerable leeway in deciding in a particular case how to go about determining whether

particular expert testimony is reliable." *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 152

(1999).

*Daubert v. Merrell Dow Pharms., Inc.*, sets a two-part test for admitting expert

testimony that focuses on the reliability and relevancy of the opinion.  509 U.S. 579, 589

(1993).  To be sufficiently reliable, the opinion must be based on "scientifically valid

principles." *Id.* at 595.  To be relevant, the testimony must "assist the trier of fact to ...

determine a fact at issue ." *Id.* at 592.  The burden is on ". . . the party proffering the evidence

[to] explain the expert's methodology and demonstrate in some objectively verifiable way that

the expert has both chosen a reliable scientific method and followed it faithfully." *Daubert v.*

*Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1319 (9th Cir. 1995).  Factors that courts

have used to evaluate the reliability of an expert's methods include:

> 1. Whether the expert's method is falsifiable or merely conclusory;
> 2. Whether the technique has been subject to peer review and publication;
> 3. The known or potential error rate of the technique;
> 4. The existence and maintenance of standards and controls;
> 5. Whether the technique has general acceptance in the relevant expert community;
> 6. Whether the substance of the testimony was prepared specifically for the instant litigation;
> 7. Whether the expert's extrapolation from an accepted premise to his conclusion was justifiable;
> 8. Whether the expert has adequately accounted for obvious alternative explanations;
> 9. Whether the expert "is being as careful as he would be in his professional work outside his paid litigation consulting";
> 10. Whether the field of expertise claimed by the expert is known

**MEMORANDUM DECISION & ORDER - 17**

> to reach reliable results for the type of opinion the expert would give.

*McClure Enters., Inc. v. General Ins. Co. of Am.*, 2008 WL 2329190, *1 -2 (D.Ariz. 2008) (citing *Daubert,* 509 U.S. at 593-595; *Daubert,* 43 F.3d at 1317; *Claar v. Burlington N.R.R.,* 29 F.3d 499 (9th Cir. 1994); *Kumho,* 526 U.S. at 149-151; Fed. R. Evid. 702, Advisory Committee Note ( 2000)). These factors are neither required nor exhaustive. *See* Fed. R .Evid. 702, Advisory Committee Note (2000). Additionally, no single factor is necessarily dispositive of the reliability of an expert's testimony. *Id.*

**B.     A Closed Avenue, or a Road for Cross Examination?**

At the June 18, 2009 hearing, the Government's counsel agreed that the standard of care for administering Pitocin and for performing a caesarean procedure within 17 minutes are judgment issues and do not require a scientific methodology or reliability under *Daubert*. Counsel identified the remaining *Daubert* issue as the alleged harm that is caused to the fetus if the fetus is not delivered by caesarean procedure in under 17 minutes and whether there is a basis for Dr. Hall's opinion on this causation issue. The Court will consider counsel's concession as a withdrawal of Defendant's *Daubert* challenge to Dr. Hall's opinions that, (1) in the face of a nonreassuring FHR tracing, Dr. Ogden breached the standard of care by failing to intervene in Ms. Trowbridge's labor by decreasing or discontinuing the Pitocin, and (2) Dr. Ogden breached the standard of care by failing to prepare for a potential urgent C-section delivery in less than 17 minutes.

The remaining challenge is to Dr. Hall's opinion that J.N.T.'s brain injury occurred as a result of the failure to deliver her by C-section in 17 minutes or less. In ruling upon this particular issue, the Court is mindful that although *Daubert* requirements are of some usefulness in the gate-keeper's screening of medical expert testimony, such testimony does not

**MEMORANDUM DECISION & ORDER - 18**

fit neatly within a traditional *Daubert* analysis.  As discussed in the Government's briefing, reliable knowledge in the medical field may simply be knowledge that other physicians "accept as useful and reliable."  *United States v. Sandoval-Mendoza*, 472 F.3d 645, 655 (9th Cir. 2006). Medical expert testimony is "specialized" knowledge and distinct (albeit on occasion overlapping) from "scientific" knowledge.  *Sullivan v. U.S. Dept. of the Navy*, 365 F.3d 827, 834 (9th Cir. 2004).  Often, medical expertise is the product of experience in the practice of medicine, which gives a physician exposure to many different clinical cases and thereby the ability to learn and act upon experiential knowledge, as contrasted to empirical studies. Medical care is often enlarged by scientific research and even directed by empirical studies, but such research and studies are not the sole source of medical learning.  Indeed, it is a hallmark of the training of new physicians that they obtain an extended period of time gaining clinical experience and knowledge, in internships and residencies.

Those factors, combined with an application of the checklist of factors set out above, convince this Court that there is no *Daubert* issue raised by Dr. Hall's criticism of Dr. Ogden's response to the information contained on the fetal monitoring strips.  Dr. Hall has the experience of years of labor and delivery practice.  The fact that not every doctor may agree upon exactly the same response to the information obtained from fetal monitoring does not mean that there is no reliable scientific method behind such monitoring.  Rather, it simply means that there may be a difference of opinion between physicians as to how to interpret the information obtained from the science of the fetal monitoring.  It is the underlying science that needs to be reliable, not that the opinions drawn from the information gained from such science need to be identical.  In other words, the record indicates that it is reliable and labor and delivery specialists use the science of fetal monitoring in providing medical care.  The *Daubert*

MEMORANDUM DECISION & ORDER - 19

threshold does not require, however, that everyone draw the same conclusions (from the fetal monitoring science) as to the implications for the health of the fetus.

The Government's criticism, therefore, is more closely related to the weight to be given to Dr. Hall's testimony by the Court as the finder-of-fact.  "[T]he weakness in the underpinnings of [expert] opinions may be developed upon cross-examination," as "such weakness goes to the weight and credibility of the testimony" as opposed to its admissibility. *Bergen v. F/V St. Patrick*, 816 F.2d 1345, 1352, n. 5 (9th Cir. 1987) (citing *Polk v. Ford Motor Co.*, 529 F.2d 259, 271 (8th Cir. 1976)).  As the *Daubert* court observed: "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."  509 U.S. at 596.

However, Dr. Hall's opinion that Dr. Ogden should have accomplished a caesarian procedure within 17 minutes does not contain such indicia of reliability, in the current record. There is no tie between such a standard and more than anecdotal reliability in Dr. Hall's experience, even recognizing the value of experience in medical knowledge.  Further, the deposition testimony of Dr. Ogden or Dr. Smith, has no references to other practitioners accepting as useful and reliable the use of 17 minutes as a benchmark for accomplishing the caesarian procedure, once indicated.  As such, to allow testimony on that particular alleged shortcoming of Dr. Ogden does invite the introduction of unreliable evidence under the false pretense of an expert's qualified opinion offered to assist the finder of fact who may not be familiar with such matters of science.

The Court is very skeptical of the *Daubert* foundation for the testimony of Dr. Hall concerning the purported 17 minute standard of care for accomplishing a caesarian procedure.

However, the Court will withhold its ruling upon Defendant's *Daubert* challenge to this

particular evidence until trial, so that the Court can make an assessment of the foundation

offered by Plaintiffs for such testimony at that time.[8]


## IV.  DR. HALL'S REBUTTAL REPORT

**A.      Legal Standards**

Federal Rule of Civil Procedure 26(a)(2)(B)(i) requires that initial expert reports

contain a "complete statement of all opinions the witness will express and the basis and

reasons for them."  Rule 26(a)(2)(C)(ii) defines rebuttal experts as presenting evidence

that "is intended solely to contradict or rebut evidence on the same subject matter

identified" by an initial expert witness report.  Courts have noted that "[a] rebuttal expert

report is not the proper place for presenting new arguments . . . ." *Ebbert v. Nassau

County*, 2008 WL 4443238 at *13 (E.D. N.Y. Sept. 26, 2008) (internal quotation marks

omitted).

If the expert disclosure rules are violated, Rule 37(c)(1) describes the

consequences:

> If a party fails to provide information or identify a witness as required by Rule
> 26(a) . . . , the party is not allowed to use that information or witness to supply
> evidence on a motion, at a hearing, or at a trial, unless the failure was substantially
> justified or is harmless.

Fed. R. Civ. P. 37(c)(1).  One federal court put it this way: "If the Rule 26(a)(2) violation

does not clear the 'justified or harmless' hurdle, then the party that failed to comply with

---

[8] This particular testimony is also challenged in the Government's Second Motion in
Limine.  That issue is addressed in a separate opinion pertaining to the second motion.

**MEMORANDUM DECISION & ORDER - 21**

the rule shall not be permitted to use such evidence." *Dixie Steel Erectors, Inc. v. Grove U.S., L.L.C.*, 2005 WL 3558663, *6 (W.D.Okla. Dec. 29, 2005).

**B.     Some of Dr. Hall's Opinions Are Not Proper Rebuttal and Will be Excluded**

Defendants argue that Dr. Hall states eight new and excludable opinions regarding chorioamnionitis and maternal fever in his rebuttal:  (1) if chorioamnionitis is a suspected cause of fetal tachycardia, then repeated hyperstimulation will further compromise the fetus; (2) the presence of fever in labor is a strong risk factor for adverse prenatal and developmental outcome; (3) where there is a change in the FHR tracing to tachycardia coupled with a maternal fever and a suspicion of chorioamnionitis, the Pitocin should be turned down; (4) it is below the standard of care to continue labor where chorioamnionitis exists and is determined to be the cause of maternal fever and tachycardia; (5) chorioamnionitis and maternal fever may lead to brain injury and may be made worse by prolonging hyperstimulation; (6) if chorioamnionitis was the suspected cause of the maternal fever and the tachycardia, the standard of care required more frequent assessment of Ms. Trowbridge's temperature; (7) if chorioamnionitis is thought to be the cause of an abnormal FHR tracing, the standard of care requires the removal of the fetus; and (8) chorioamnionitis is an independent risk factor for cerebral palsy.  Def.'s Mem., p. 26 (citing Ex. H, Hall's Rebuttal Letter, pp. 5-6; 9).

Dr. Ogden testified at his August 20, 2008 deposition that he suspected Ms. Trowbridge's fever was caused by an infection, chorioamnionitis, and determined that the fetal tachycardia was "certainly due" to the maternal fever.  Grisham Decl, Ex. 2, Ogden Dep., pp. 14-16 (Docket No. 58-2).  In his September 2, 2008 affidavit ("initial disclosure"), Dr. Hall stated that he had reviewed Dr. Ogden's deposition testimony.

Def.'s Mem., Ex. F, Hall Aff., p. 3 (Docket No. 58-58-8).  Thus, Dr. Hall knew Dr. Ogden's assessment involving the maternal fever before he prepared his initial report.  In that report he asserts a standard of care that doctors should know how to "[p]erform a differential diagnosis for symptoms with multiple possible causes," and that Dr. Ogden breached that standard by "failing to consider and respond to allow the potential differential diagnoses."  *Id.* at pp. 3-4.

Although the presence of a maternal fever and considering it in combination with the other circumstances present during Ms. Trowbridge's labor fairly fall within Dr. Hall's opinion that Dr. Ogden failed to consider and respond to all of the potential diagnoses, any opinion as to the standard of care in the face of maternal fever alone is not a part of his initial report.  At the time he prepared this report, Dr. Hall should have known that Dr. Ogden managed the labor and delivery with his diagnosis of chorioamnionitis in mind,[9] and could have opined at the outset that this condition alone may lead to brain injury, requires more frequent assessment of the mother's temperature, and that it is below the standard of care to continue labor where chorioamnionitis exists.

Plaintiffs did not submit in their response to this motion any portions of Dr. Hall's deposition testimony where he discussed the standards of care related to the maternal fever/chorioamnionitis.  Dr. Hall did testify about his differential diagnoses opinion: "The differential diagnosis of fetal tachycardia includes fever, but it includes hypoxia as well. [Dr. Ogden] failed to recognize the hypoxic event, which is more serious than the tachycardia due to the fever which he treated . . . "  Grisham Decl, Ex. 1., Hall Dep., p. 63;

---

[9]  Review of the deposition testimony reveals he did know about Dr. Ogden's diagnosis. *See* Grisham Decl, Ex. 1., Hall Dep., pp. 154-55.

*see also* pp. 154-68. Review of Dr. Hall's deposition testimony indicates that he focused on Dr. Ogden's alleged failure to recognize or respond to hypoxia and not the standards for how he should have managed the maternal fever or its independent consequences. *See, e.g.*, *id.* at p. 168-69.

Additionally, although Doctors Depp and Garite opined in their reports that fetal tachycardia resulting from maternal fever arising from chorioamnionitis is not expected to disappear one hour after the administration of antibiotics to the mother, this was in connection with their statements that the applicable standard of care does not require providers to suspect that persisting tachycardia has resulted from fetal hypoxia, as opposed to maternal fever. *See* Docket No. 61, Ex. A (Garite Report, p. 8); *Id.*, Ex. B. (Depp Report, p. 11). Plaintiff has cited to no portion of these experts' reports in which they opine about the consequences of continuing labor when maternal fever presents. For this reason alone, Dr. Hall's testimony about the standard of care required when maternal fever presents from suspected chorioamnionitis is not proper rebuttal.

Additionally, the Court finds persuasive the Government's description of Dr. Hall's rebuttal opinions as assuming that Dr. Ogden's diagnosis — that the fever and chorioamnionitis were the cause of the tachycardia— were correct, and then criticizing this treatment decision. *See* Reply, p. 7 (Docket No. 71). Dr. Hall could have challenged this decision, and opined about the consequences of it, in his initial report and deposition testimony. Instead, he chose to focus on what Dr. Ogden did not consider, treat, or do that he should have done to manage the labor and ensure a healthy baby was delivered.

For all of these reasons, the Court will limit Dr. Hall's testimony, excluding testimony related to the standard of care for treating chorioamnionitis, as follows: Dr.

**MEMORANDUM DECISION & ORDER - 24**

Hall may testify about the following opinions: (1) if chorioamnionitis is a suspected cause of fetal tachycardia, then repeated hyperstimulation will further compromise the fetus; (2) the presence of fever in labor is a strong risk factor for adverse prenatal and developmental outcome; and (3) where there is a change in the FHR tracing to tachycardia coupled with a maternal fever and a suspicion of chorioamnionitis, the Pitocin should be turned down. The following testimony is excluded: (4) it is below the standard of care to continue labor where chorioamnionitis exists and is determined to be the cause of maternal fever and tachycardia; (5) chorioamnionitis and maternal fever may lead to brain injury and may be made worse by prolonging hyperstimulation; (6) if chorioamnionitis was the suspected cause of the maternal fever and the tachycardia, the standard of care required more frequent assessment of Ms. Trowbridge's temperature; (7) if chorioamnionitis is thought to be the cause of an abnormal FHR tracing, the standard of care requires the removal of the fetus; and (8) chorioamnionitis is an independent risk factor for cerebral palsy.

## V.  ORDER

**IT IS THEREFORE HEREBY ORDERED** that Defendant's Motion in Limine (Docket No. 58) is GRANTED, in part, and DENIED, in part as set forth more particularly above.

DATED:  **June 25, 2009**

_____
Honorable Ronald E. Bush
U. S. Magistrate Judge